**Affirmed and Memorandum Opinion filed December 22, 2011.**



In The

# Fourteenth Court of Appeals

### NO. 14-10-00747-CR

**JORDAN THOMAS AYERS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1233976**

## MEMORANDUM OPINION

Appellant Jordan Thomas Ayers appeals his conviction for aggravated assault on a public servant and sentence of twenty-years' incarceration. In three issues, appellant claims the evidence is legally insufficiency to support his conviction and the trial court erred by prohibiting cross-examination about grand jury proceedings. We affirm.

### BACKGROUND

On April 6, 2009, Sergeant Frank Fullbright of the Harris County Sheriff's Department, who was assigned to a major violator narcotics task force, was conducting surveillance on a motel. Fullbright was working undercover in plainclothes—jeans and a

fish-print shirt—instead of a uniform and was driving an unmarked Chevrolet pickup truck. Fullbright noticed two people in a Pontiac Grand Prix—appellant as the driver and Jerry Ramirez as the passenger—drive through the motel parking lot. Fullbright called Officer N.J. Hernandez of the Houston Police Department to advise that he had observed the people in the Grand Prix attempt to burglarize vehicles. Hernandez and his partner Officer Mike Duncan were assigned to a "hot spot unit" in northeast Houston.[1] Fullbright and Hernandez had known each other and worked together for a number of years. Hernandez and Duncan were in uniform, but had on a jacket or shirt to conceal their uniforms and were driving an unmarked Ford F-150 pickup truck. Hernandez and Duncan, who were about a mile from the location of the motel, proceeded to the motel.

After being "spooked" when they tried break into a car at the motel, appellant and Ramirez drove to another parking lot at a medical clinic. Fullbright, Hernandez, and Duncan, who were in their unmarked vehicles at a shopping center across the street, observed Ramirez try to open the door on a vehicle, but he was "spooked" again because he quickly got back into the Grand Prix. The pair then drove to the same parking lot where the officers were positioned. The officers observed appellant and Ramirez drive up and down the aisles of the parking lot, looking inside different vehicles. The officers followed the pair when they left and got on I-10 and drove to the west side of Houston to the West Sam Houston Parkway.

The pair drove through a shopping center parking lot, looking at vehicles, and then proceeded to the parking lot of the Houston Community College (HCC), eventually pulling up next to a Dodge Durango. Appellant looked inside the vehicle, and Ramirez, using a screw driver, pried open the door handle, got into the Durango, and then got back into the Grand Prix. At that point, the officers decided to take appellant and Ramirez into custody.

---

[1] Hernandez testified that a hot spot unit is a two-man unit that works in high crime areas on robberies, burglaries, auto thefts, and burglaries of motor vehicles. They work in both marked patrol units and undercover vehicles and full uniform and civilian clothes.

After burglarizing the Durango, appellant and Ramirez pulled up next to a Chevrolet Tahoe. To block the Grand Prix from leaving, Hernandez and Duncan pulled up behind it and Fullbright pulled up in front of it.

Before exiting the Ford pickup truck, Duncan unbuttoned his jacket and tucked the tail into the back of his belt so that his uniform and badge would be visible. With his service weapon drawn, Duncan approached the passenger side of the Grand Prix from behind and was about four feet to side of the passenger's side door. Ramirez turned and looked at Duncan several times. Duncan yelled at Ramirez to put his hands on the dashboard. Ramirez did not comply.

Hernandez dropped the windbreaker he was wearing over his black raid jacket, with the word "police" in yellow letters, and uniform so that appellant and Ramirez would know that he was a police officer. Hernandez approached from the left rear side of the Grand Prix. According to Hernandez, appellant "looks back towards me, and then looks up at the rear-view mirror and sees me. . . . [Appellant] made eye contact with me when he looked in the rear-view mirror."

Fullbright exited the Chevy pickup truck and was in front of the Grand Prix. Although Fullbright was wearing plainclothes, his badge was hanging on a chain around his neck facing out, his service weapon was in his right hand, and his identification was in his left hand. All three officers were loudly identifying themselves as police and yelling at appellant to turn off the engine. Instead of complying with those commands, appellant backed up and then drove forward at a high rate of speed. Fullbright was about eight feet in front of the Grand Prix. Fullbright testified that he made eye contact with appellant: "He saw me. He was looking at me and I was looking at him." The Grand Prix hit Fullbright, and he landed on the hood. Fullbright described the event: "I remember him driving straight at me. And the car hit me, hit me right in the knees, and I flew up over the hood and I next thing I know my face hit the windshield . . . ."

3

Fullbright testified that he saw the driver facing him and he knew the driver "was trying to kill [him]." Fullbright was hanging on to the hood and fired twice directly at appellant.

It felt to Fullbright like the Grand Prix hit another vehicle because he was "ejected" off the hood. Fullbright described what happened: "[A]s I went off the hood I went kind of off to the driver's side by the wheel well, and [as] soon as I hit the ground, I figured it was a door, I don't think his door was shut at the time, I think the door came back and hit me in the back and when it did it kind of knocked me under the car. And I remember looking up and I could see the wheel wells and the undercarriage of the car, and how I didn't get run over by the wheels I'll never know, . . ." Fullbright landed on the ground, with his weapon and identification falling near him. Herndanez moved the Ford pickup truck and positioned it so that no one else would run over Fullbright. Fullbright suffered numerous injuries, including five broken ribs in the back and two in the front.

The Grand Prix sideswiped two vehicles when it left the HCC parking lot. Appellant hit the curb of the U-turn lane in the underpass at the West Sam Houston Parkway and I-10, blowing out both front tires. Appellant fled on foot and was apprehended by Harris County Deputy Constable Greg Mahannah about three-quarters of a mile away, near an elementary school. Mahannah heard on the Houston police radio that a shooting involving an officer had taken place at the HCC campus. Mahannah spotted appellant, who matched the description of the suspect, walking near an elementary school, handcuffed him, called his dispatcher to notify HPD, and called an ambulance.

Appellant testified at the guilt-innocence stage of his trial. Appellant admitted that he had four prior convictions for unauthorized use of a motor vehicle and two for evading arrest. Appellant testified that he agreed to Ramirez's plan to break into cars that day. According to appellant, after Ramirez broke into the Durango at the HCC parking lot, Ramirez told him to back into a parking space and "just chill." Appellant claimed he had

4

the music turned all the way up. The windows of the Grand Prix were rolled up and the engine was running.

Appellant saw a pickup truck park in front of the Grand Prix and Fullbright jump out the truck. Appellant claimed he did not see Fullbright's badge or identification, but he saw Fullbright's weapon. Appellant did not know that Fullbright was a police officer, but, instead, thought Fullbright was going to rob him. Appellant testified that he did not see Hernandez or Duncan coming from behind the Grand Prix and he did not make eye contact with Hernandez. Contrary to Fullbright's testimony, appellant stated that as he started backing up, he was shot in the mouth and panicked.[2] Appellant claimed that he did not remember hitting Fullbright or blowing out the tires on the Grand Prix. Contrary to Mahannah's testimony, appellant claimed that he flagged down Mahannah for help.

HCC student Juan Ferriero testified that he heard someone yell the word "police" and then he heard five to eight gunshots. During the gunshots, Fierro saw Fullbright standing in front of the car. Ferriero ducked behind a car and, when he looked up again, he saw Fullbright on top of the windshield. Ferriero ducked again when more shots were fired and he saw Fullbright fall off the car. Ferriero testified that he did not see Hernandez or Duncan shoot their guns, but he saw smoke coming from their guns. However, Hernandez and Duncan stated that they had not fired their weapons and investigators at the scene confirmed that their weapons had not been fired.

The jury found appellant guilty of aggravated assault on a public servant and assessed punishment at twenty-years' incarceration. This appeal followed.

---

[2] Fullbright testified that "[t]he car had already struck me, hit me, and impaled me into the windshield before I fired the first shot. Duncan similarly testified that Fullbright did not fire those shots into the windshield before the car struck him.

5

## ANALYSIS

### Intentionally or Knowingly Threatened

In his first issue, appellant contends that the evidence is legally insufficient to show that he intentionally or knowingly threatened Fullbright. We review the sufficiency of the evidence in this case under a rigorous and proper application of the *Jackson v. Virginia*, 443 U.S. 307 (1979), legal sufficiency standard. *Brooks v. State*, 323 S.W.3d 893, 906 (Tex. Crim. App. 2010) (plurality opinion). When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *see also Jackson*, 443 U.S. at 319. The jury is the exclusive judge of the credibility of witnesses and the weight to be given to the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Further, we defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence. *Id.* We draw all reasonable inferences from the evidence in favor of the verdict. *Id.* This standard applies to both circumstantial and direct evidence. *Id*.

To sustain a conviction for aggravated assault of a public servant, the evidence must demonstrate that (1) the person intentionally or knowingly threatened another with imminent bodily injury, (2) the person used or exhibited a deadly weapon during the commission of the assault, and (3) the offense was committed against a person the actor knew was a public servant while the public servant was lawfully discharging an official duty. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2), (b)(2)(B)). The actor is presumed to have known the person assaulted was a public servant if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant. TEX. PENAL CODE ANN. § 22.02(c).

6

"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Moreover, "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b). Finally, "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* A defendant's intent or knowledge is a question of fact, which is determined from the totality of the circumstances. *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998); *Dobbins v. State*, 228 S.W.3d 761, 764 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd). The State can prove a defendant's knowledge or intent without evidence of threatening language or gestures, and the jury may infer the existence of either mental state from any facts tending to prove its existence, including the defendant's acts, words, and conduct. *Dobbins*, 228 S.W.3d at 765.

Appellant argues that the evidence failed to prove beyond a reasonable doubt that he intended to place Fullbright in fear by using or exhibiting the motor vehicle. Appellant asserts, "Probably Fullbright was fearful when he was atop the hood of the car, but that does not necessarily mean the appellant either intended to scare Fullbright by driving into him or knew that he would scare Fullbright by doing that." Appellant further points to Fullbright's testimony that, when appellant refused to comply with the officers' orders, he was not resisting arrest, but "was just trying to get away."

The record shows that Fullbright and appellant made eye contact before appellant backed up and then drove into Fullbright at a high rate of speed. Fullbright was eight feet in front of the Grand Prix. Fullbright testified: "I looked through the windshield and I saw the driver facing me . . . And I know he was trying to kill me."

7

Even if appellant only intended to flee the scene but was aware that driving his vehicle at Fullbright was reasonably certain to place him in fear of imminent bodily injury, appellant acted with the requisite mental state to be guilty of knowingly threatening imminent harm. *See* TEX. PENAL CODE ANN. § 6.03(b) ("A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."); *Dobbins*, 228 S.W.3d at 765 (holding that evidence was sufficient to show that the appellant intentionally or knowingly threatened a deputy constable where the appellant drove directly at the constable but stopped when he raised his hand and asked the appellant to stop, started driving again, hitting the deputy and lifting him onto the hood as the deputy walked in the direction of the driver's side, and continued to drive with the deputy on the hood—long enough for the deputy to pull his pistol, repeatedly yell commands to stop, and call for assistance on his radio—instead of stopping); *Creighton v. State*, No. 08-09-00022-CR, 2011 WL 743073, at *3 (Tex. App.—El Paso Mar. 2, 2011, no pet.) (not designated for publication) (holding that evidence was sufficient to establish intent to threaten with imminent bodily harm where the officer arrived on scene, approached the passenger side of the appellant's vehicle and indicated in very loud voice that he needed to talk to the appellant, but the appellant disregarded the officer's instructions, backed up his vehicle, stopped, put his vehicle into drive, and turned the wheels toward the officer, who was standing ten feet away from the front of the vehicle, and accelerated towards the officer, requiring him to jump onto curb to get out of harm's way); *Martinez v. State*, No. 08-01-00358-CR, 2003 WL 21710757, at *5 (Tex. App.—El Paso July 24, 2003, no pet.) (not designated for publication) (concluding that a rational jury could reasonably infer from the appellant's conduct that he intentionally and knowingly threatened an officer by driving straight towards the officer while the officer was standing approximately twenty feet in front of the appellant's vehicle and ordering the appellant to desist; even if the appellant did not intentionally threaten the officer by use of his motor vehicle, the jury

could infer that the appellant was aware that his conduct was reasonably certain to cause a threat of imminent bodily injury).

Appellant's conduct after hitting Fullbright is further evidence of his intent to threaten Fullbright and his knowledge that his actions would have that result. *See Dobbins*, 228 S.W.3d at 765-66 (holding that the appellant's conduct after driving the vehicle into the officer also constituted evidence of his intent to threaten the officer and his knowledge that his actions would have that result). Rather than stopping immediately after hitting Fullbright, appellant continued to drive with Fullbright on top of the hood for approximately eight to ten parking places or six to eight seconds—long enough for Fullbright to fire two shots from his weapon, and for what seemed like a "long time" to Fullbright. After Fullbright was ejected from the hood, the car struck Fullbright again. As he continued to flee, appellant sideswiped two other vehicles and struck a curb in the underpass, blowing out both front tires. Because the car could no longer be driven, appellant continued to flee on foot until a deputy constable apprehended him about three-quarters of a mile away.

We hold that the evidence is sufficient to show that appellant intentionally and knowingly threatened Fullbright with imminent bodily injury and overrule appellant's first issue.

### Public Servant Lawfully Discharging an Official Duty

In his second issue, appellant contends that the evidence is legally insufficient to show that he knew Fullbright was a public servant who was in the lawful discharge of his official duty. The jury was instructed on the following presumption:

> The defendant is presumed to have known the person assaulted was a public servant if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant.[3]

---

[3] *See* TEX. PENAL CODE ANN. § 22.02(c).

9

Appellant claimed that he did not know Fullbright was an officer. Although Fullbright testified that his badge hung on a chain on his "fishing" pattern shirt, appellant argues that the badge would not have been visible on a running person, displayed against a patterned background in a view lasting on a few seconds. Appellant also argues that, because Fullbright's identification was a "flap type" identification, "[t]his would have been no more telling as to Fullbright's status than if Fullbright had flipped open a wallet and waved it in the air as he was running." Appellant further asserts that that he could not have possibly read the fine print on Fullbright's identification card.

Appellant states that the most conspicuous item Fullbright displayed was a handgun, which he argues, in Houston, "this could mean either a policeman or robber." Although the officers said they shouted "police," appellant contends that it was not clear that he heard them because the engines on the three vehicles were running and the music in the Grand Prix was purportedly turn all the way up. Appellant further points out that Fullbright testified that he shouted statements punctuated with epithets and argues, "[b]etween the loud, dirty words from Fullbright's mouth and the loud, dirty words from the rap song playing in the car, it is not at all clear that the appellant heard the word 'police.'"

Hernandez testified that he "dropped" the windbreaker he was wearing over his police raid jacket and uniform so that appellant and Ramirez would know that he was a police officer. Duncan testified that he unbuttoned the shirt covering his uniform and tucked the tail of the shirt into the back of his belt so that his uniform would be visible. Hernandez and Duncan approached the Grand Prix loudly identifying themselves as police officers. The passenger looked at Duncan several times and appellant and Hernandez made eye contact. Like Hernandez and Duncan, Fullbright loudly identified himself as a police officer, and was approaching the vehicle about the same time Hernandez and Duncan were. Fullbright's badge was hanging on a chain around his neck. The badge lay on Fullbright's chest, facing outward.

10

Appellant claimed at trial that he would have turned off the engine and exited the vehicle if had known that Fullbright was a police officer. However, appellant admitted that he had two prior convictions for evading arrest for which he had pleaded guilty. Appellant also agreed to Ramirez's unlawful plan to break into cars that day.

Here, the jury was the exclusive judge of the credibility of witnesses and the weight to be given to the evidence. *See Isassi*, 330 S.W.3d at 638. It was in the jury's province to resolve or reconcile any conflicts in the evidence. *See id.* The jury could infer that appellant was aware that Fullbright was a police officer, working with two other police officers, who were in full uniform, attempting to apprehend appellant and Ramirez for burglarizing a vehicle, and reject appellant's claim that he thought Fullbright was attempting rob him. We overrule appellant's second issue.

### Exclusion of Evidence Concerning Grand Jury Proceedings

In his third issue, appellant asserts that the trial court erred by prohibiting cross-examination about the amount and type of evidence presented to the grand jury that no-billed Fullbright.

After the defense rested, the State called Bill Jordan, an investigator with the Harris County District Attorney's Office, as a witness. Jordan testified that he investigates officer-involved shootings to determine whether an officer may have done anything criminally wrong. Jordan explained that all the facts of the police shooting are presented to a grand jury, which ultimately determines whether there was any officer wrongdoing. Jordan, who responded to the scene involving Fullbright, explained that "[a]ll the facts of the case were presented [to the grand jury]. Fullbright was the target of the investigation, because he was the only one that we had evidence that did any shooting." Jordan testified that the grand jury did not find any criminal wrongdoing by Fullbright and no-billed him.

11

When appellant's counsel attempted to question Jordan on cross-examination about whether any witnesses were called to explain to the grand jury what happened, the trial court sustained the State's objection based on relevance. The following took place:

Q.      Were any witnesses called to the grand jury to explain what happened?

      [THE STATE]:      I'm going to object to relevance, your Honor.

      THE COURT:      That's sustained.

      [APPELLANT'S COUNSEL]:      Judge, I'd ask leeway in this regard.  He's got in whether it was a no bill.  I think the jury's entitled to know how much evidence they heard to make that determination.

      THE COURT:       The objection is sustained.

Q. (By Mr. Easterling)      Was my client called to the grand jury to try to explain his side of it?

      [THE STATE]      Objection, relevancy, your Honor.

      THE COURT:      That's sustained.

Q.      (By Mr. Easterling) Were you present when the case was presented to the grand jury?

      [THE STATE]:      Objection, relevancy, your Honor.

      THE COURT:      I'll let him answer that, then we'll move on.

Q.      (By Mr. Easterling) Go ahead, sir.

A.      No I was not.

Q.      So what you're testifying to is hearsay; is that correct?  You don't have any personal knowledge of it?

A.      (No response.)

Q.      You know what hearsay is?

A.      I don't know what you're referring to, though.

12

MR. EASTERLING:    I'll pass the witness.

Appellant made no complaint to the trial court that his right of cross-examination was being improperly limited. To preserve error when the trial court excludes evidence, the proponent must object, obtain a ruling from the trial court, and make the substance of the excluded evidence known in the form of an offer of proof, or the excluded evidence must have been apparent from the context. TEX. R. EVID. 103(a)(2); TEX. R. APP. P. 33.1(a)(1). The proponent must also state the grounds for the ruling he desires "with sufficient specificity to make the trial court aware of the complaint." TEX. R. APP. P. 33.1(a)(1)(A). Preservation requirements apply to confrontation clause complaints. *Robinson v. State*, 310 S.W.3d 574, 577 (Tex. App.—Fort Worth 2010, no pet.). When a single objection encompasses complaints under both the Texas Rules of Evidence and the Confrontation Clause, the objection is not considered sufficiently specific to preserve error. *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005).

Because appellant did not specifically assert his right to confrontation, appellant has waived his confrontation and cross-examination complaint. *Robinson*, 310 S.W.3d at 578 (holding that the appellant's failure to object to limitation of cross-examination waived his right to raise such complaint on appeal); *Gibbs v. State*, 7 S.W.3d 175, 178 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (holding that the failure to object to the trial court's limitation on cross-examination waives objection on appeal). We overrule appellant's third issue.

Having overruled all of appellant's issues, we affirm the trial court's judgment.


                                        _
                              /s/    Sharon McCally
                                     Justice

Panel consists of Justices Brown, Boyce, and McCally.

Do Not Publish — TEX. R. APP. P. 47.2(b).

13